IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL CASE NO.

1:12-CR-409-TCB-RGV

TREMAIN HUTCHINSON

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Defendant Tremain Hutchinson ("Hutchinson") is the sole defendant charged in a twenty-four count indictment with 11 counts of knowingly coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct while knowing and having reason to know that such visual depiction would be transported and transmitted in interstate commerce by any means, including by computer and telephone, in violation of 18 U.S.C. § 2251(a) and (e); 6 counts of using any facility and means of interstate commerce, including computer and telephone, to knowingly persuade and attempt to persuade a minor to engage in sexual activity for which any person could be charged with a criminal offense, in violation of 18 U.S.C. § 2422(b); 2 counts of using any facility and means of interstate commerce, including by computer and telephone, to knowingly transfer obscene material to an individual whom he knew had not obtained the age of 16 years, in violation of 18 U.S.C. § 1470; 3 counts of knowingly distributing one or more visual

depictions of minors engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256(e), said depictions having been produced using minors engaging in sexually explicit conduct and shipped and transported in interstate commerce by any means, including by computer and telephone, in violation of 18 U.S.C. § 2252(a)(2) and (b); 1 count of knowingly advertising, promoting, presenting, distributing, and soliciting, using any means and facility of interstate commerce, including the Internet, material and purported material in a manner that reflected the belief, and was intended to cause another to believe, that the material and purported material was and contained a visual depiction of actual minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), in violation of 18 U.S.C. § 2252A(a)(3)(B) and (b); and 1 count of knowingly possessing a computer and telephone containing one or more visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), said depictions having been produced using minors engaging in sexually explicit conduct and shipped and transported in interstate and foreign commerce, by any means, including by computer and telephone, in violation of 18 U.S.C. § 2252(a)(4)(B). [Doc. 59].[1] Hutchinson filed a motion to suppress identifications, [Doc. 21], a motion to suppress statements, [Doc. 23], and a motion to suppress evidence

---

[1] The document and page numbers listed in citations to the record refer to the documents and pages listed in the Adobe file reader linked to this Court's electronic filing database, CM/ECF.

pursuant to a warrantless search, [Doc. 25], and following an evidentiary hearing on March 20, 2013,[2] Hutchinson filed a post-hearing brief in support of his motion to suppress identifications, [Doc. 55], and his motions to suppress statements and evidence, [Doc. 49], to which the government has responded, see [Doc. 57 (identifications); Doc. 56 (statements and evidence)]. For the following reasons, the undersigned **RECOMMENDS** that Hutchinson's motions to suppress, [Docs. 21, 23, 25], be **DENIED**.

## I. FACTUAL BACKGROUND

**A.    Facts Related to the April 5, 2012, Interview**

On or about February 9, 2012, Detective Torrey Kennedy ("Detective Kennedy") of the DeKalb County Police Department's Internet Crimes Against Children Unit ("ICAC Unit"), was contacted by a detective in the Special Victims Unit ("SVU") who was investigating a case involving a 15 year-old girl ("VN1"), who had been accused of performing sexual acts on her 13 year-old brother ("VN2"). (Tr. at 20-22). During the course of the SVU's investigation, it was discovered that VN1 had been coerced by an unknown person via the Internet and text messages to perform

---

[2] See [Doc. 46] for a transcript of the March 20, 2013, evidentiary hearing, which will be referred to herein as "(Tr. at ___)." The parties submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. ____)" for the government's exhibits and "(Def. Ex. ___)" for Hutchinson's exhibits.

the acts.  (Tr. at 21-22).   Thereafter, Detective Kennedy was assigned to the investigation.  (Tr. at 21).

In order to identify the person who had been communicating with VN1, Detective Kennedy performed a Google search on the cell phone number VN1 had provided.  (Tr. at 23).  The search revealed several complaints from people who said that they had received threats from someone using the same number as the one used to threaten VN1.  (Id.).  Detective Kennedy also subpoenaed subscriber information from T-Mobile, the service provider for the cell phone number.  (Id.).  On or about March 19, 2012, Detective Kennedy received the subscriber information, which indicated that the owner of the phone was Janice Reynolds ("Reynolds"), who lived in Mableton, Georgia.[3]  (Id.).  After meeting with the ICAC Unit, Detective Kennedy decided to conduct a knock-and-talk[4] at Reynolds' residence to make contact with the possible owner of the phone and try to identify the person who had been communicating with VN1.  (Tr. at 23-24).

---

[3] A public records search for Reynolds confirmed her address.  (Tr. at 23).

[4] Detective Kennedy testified that in conducting a knock-and-talk, he is not planning to arrest anyone or take them into custody, but instead just go out and have a casual conversation to gather information to further the investigation.  (Tr. at 28); see also Florida v. Jardines, 133 S.Ct. 1409, 1423 (2013) (citation and internal marks omitted) (defining a "knock and talk" as "knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence").

Between approximately 8:00 a.m. and 9:00 a.m. on April 5, 2012, Detective Kennedy, along with Sergeant Dave Brown ("Sergeant Brown") and Detective Miller from the ICAC Unit[5] and two officers from the Cobb County Police Department, one of whom was a plainclothes detective and one of whom was in uniform, went to Reynolds' apartment.  (Tr. at 25-26).  Detective Kennedy knocked on the door, and Reynolds' son, Hutchinson, opened the door.[6]  (Tr. at 25-27, 30); see also (Gov. Ex. 2 at 1:33-2:22).[7]  Detective Kennedy identified himself without drawing his gun[8] or making any threats, and asked to speak to Reynolds, and Hutchinson said she was at work and asked why the officers were there.  (Tr. at 26-27, 30); see also (Gov. Ex. 2 KT at 1:33-2:22).  Detective Kennedy explained that he wanted to talk to Reynolds

---

[5] All three DeKalb County police officers were dressed in plainclothes.  (Tr. at 27).

[6] As was his standard practice, Detective Kennedy recorded his conversation with Hutchinson without informing Hutchinson that he was being recorded.  (Tr. at 27-28).  Detective Kennedy testified that he did so because witnesses who know they are being recorded tend to not talk, but the recording protects him from unreliable statements or complaints.  (Id.).

[7] Government's Exhibit 2 consists of two audio files.  The first file is titled "12-004825 Knock and talk @ Hutchinson apartment in Cobb County 4-5-12."  Citations to that file will be referred to as "(Gov. Ex. 2 KT)."  The second file is titled "12-004825 Tremain Hutchinson @ SVU 4-5-12."  Citations to that file will be referred to as "(Gov. Ex. 2 SVU)".

[8] Detective Kennedy testified that "under normal circumstances, [his and the other plainclothes officers' guns] would have been visible" but that they were "not like in hand or anything."  (Tr. at 27).

about a case that he was investigating and asked Hutchinson where she worked. (Tr. at 26-27, 30); see also (Gov. Ex. 2 KT at 1:33-2:22).  Hutchinson said that he was not going to tell Detective Kennedy where his mother worked and then stated, "Talk to me."  (Tr. at 26-27, 30); see also (Gov. Ex. 2 KT at 1:33-2:22).  Detective Kennedy responded, "It's a bad idea to talk right here if you want your business put in the street."  (Tr. at 26-27, 30); see also (Gov. Ex. 2 KT at 1:33-2:22).  Hutchinson then said, "Okay.  Everybody can come in."  (Tr. at 26-27, 30); see also (Gov. Ex. 2 KT at 1:33-2:22).

Upon entering the apartment, Hutchinson asked if it was okay if he used the restroom,[9] and although Detective Kennedy was uncomfortable with Hutchinson moving around the apartment, he responded that it was.[10]  (Tr. at 26-27, 30, 53); see also (Gov. Ex. 2 KT at 1:33-2:22).  Detective Kennedy explained to Hutchinson that a teenager was talking online to another person, that the two got into an altercation, and that the teenager was being threatened.  (Gov. Ex. 2 KT at 4:04-10:15).  He told

---

[9] Hutchinson also subsequently went to brush his teeth.  See (Gov. Ex. 2 KT at 6:15-7:57).  Although Detective Kennedy testified that he did not follow Hutchinson into the bathroom, (Tr. at 53-54), Detective Kennedy and Hutchinson can both be heard on the recording while Hutchinson was brushing his teeth, see (Gov. Ex. 2 KT at 6:15-7:57).

[10] Detective Kennedy testified that he was uncomfortable with Hutchinson roaming the apartment for safety reasons because he "didn't know what was [on Hutchinson's] mind," but that he "never stopped [Hutchinson] from doing whatever he needed to do."  (Tr. at 53).

Hutchinson that he had traced the phone of the person who was threatening the teenager to the apartment.  (Id.).  He further explained that the teenager's mother was upset and thought there might be a predator contacting her daughter.  (Id.). Detective Kennedy stated that his objective was to determine who was sending the messages, identify the cell phone, and to make the behavior stop.  (Id.).

Detective Kennedy then asked Hutchinson what his cell phone number was. (Gov. Ex. 2 KT at 6:17-7:28).  Hutchinson said that he did not know his cell phone number and instead called Detective Kennedy so that his number would show up on the caller identification.  (Id.).  Seeing that the phone Hutchinson had called him from was not the target phone, Detective Kennedy subsequently called the number that was the source of the texts to VN1.  (Gov. Ex. 2 KT at 9:09-9:13, 12:15-12:35); see also (Tr. at 30-31).  When the target phone rang inside the apartment, Hutchinson told Detective Kennedy that it was his sister's phone[11] and Detective Kennedy told Hutchinson, "That's the phone I'm looking for."  (Gov. Ex. 2 KT at 12:15-12:35).  He then asked if he could see the phone, and Hutchinson said, "Yeah."  (Id.); see also (Tr. at 30-31, 69).[12]

---

[11] Hutchinson later explained that he and his sister shared the phone.  (Gov. Ex. 2 KT at 14:22-16:10, 22:10-22:40).

[12] Detective Kennedy testified that although he took the phone from Hutchinson during their conversation, he gave it back to him even after he had seen the pictures, and that throughout their conversation Hutchinson "had access to the

Sergeant Brown asked Hutchinson if he chatted with girls online, and Hutchinson said that he did chat with girls but he did not know anything about the incident being investigated. (Gov. Ex. 2 KT at 10:42-13:07). Detective Kennedy then posed a hypothetical, saying, "Suppose you met a young lady on a chat line . . . on a computer. Y'all exchange phone numbers, then y'all start exchanging conversations –well, sexual conversations and things of that nature . . . and pictures, y'all start sending each other pictures. Do you know what I'm talking about?" (Gov. Ex. 2 KT at 13:07-13:24). Hutchinson responded by volunteering to let Detective Kennedy view the photographs on his phone, saying "I'll show you every picture on the phone, man." (Gov. Ex. 2 KT at 13:24-13:26); <u>see also</u> (Tr. at 31). Detective Kennedy then looked through the phone, at one point asking Hutchinson who a particular woman was, and Hutchinson responded that he had probably met that woman on the Internet. (Gov. Ex. 2 KT at 14:22-15:03).

Sergeant Brown then told Hutchinson that it was okay to meet women on the Internet, unless they were underage. (Gov. Ex. 2 KT at 14:30-15:03). Later, Sergeant Brown suggested that since Hutchinson admittedly talks to a lot of women online, one of the people that he was talking to might have been underage. (Gov. Ex. 2 KT

---

phone, and he was actually trying to show [the officers] how to use the website he was using on his phone." (Tr. at 54).

at 17:02-17:30).  He asked Hutchinson if he would intentionally talk to an underage

girl, and Hutchinson said that he would not.  (Id.).  Sergeant Brown told Hutchinson

that if he had unintentionally talked to an underage girl, Hutchinson should just tell

them about it.  (Id.).  Hutchinson then said that he needed information from the

detectives before he would talk to them.[13]  (Id.).  Sergeant Brown then offered to first

review the text messages from the phone with Hutchinson, who agreed.  (Gov. Ex.

2 KT at 17:30- 17:38).

Sergeant Brown then asked Hutchinson what he did with the pictures he

received, and Hutchinson responded that he deleted them, saying, "You looked in

the phone, the pictures that's in there . . . I probably got last night.  I don't keep no

pictures in the phone."  (Gov. Ex. 2 KT at 17:48-18:11, 22:40-22:55).  Sergeant Brown

asked Hutchinson if he saved text messages, and Hutchinson said he did not.  (Gov.

Ex. 2 KT at 22:49-23:03). Sergeant Brown asked if Hutchinson saved phone numbers,

and then asked, "Do you mind if I check if you happened to save [VN1's] number in

there?" to which Hutchinson responded, "You haven't told me her number yet.

---

[13] When the detective told Hutchinson that he seemed to be hiding things from
them or lying, which was making the incident a "bigger deal" than it was if he had
simply talked to an underage girl by mistake, Hutchinson explained that he wanted
to know more details about what was going on because, although he was willing to
help the detectives, he was from the "hood" and he did not want to be labeled a
"snitch" later.  (Gov. Ex. 2 KT at 20:44-21:36).

That's what I asked y'all."[14]   (Id.).   Sergeant Brown responded by suggesting that Hutchinson go to his contacts, which Hutchinson apparently did as Sergeant Brown asked a few minutes later, "Would you mind going to the contacts again? I hit the wrong button."   (Gov. Ex. 2 KT at 24:45-24:55).   Sergeant Brown then asked Hutchinson whether he used the computer to talk to girls, and Hutchinson answered negatively before saying, "Y'all can do whatever you need to do, my man.  As long as you clear my name out this [expletive], I don't give a [expletive] what you do." (Gov. Ex. 2 KT at 24:53-25:13).

The detectives then suggested that, in an attempt to quickly make sense of the evidence and, as Hutchinson had requested, clear his name, they go to the police

---

[14] Earlier in the conversation, Hutchinson had asked the officers to tell him VN1's phone number, because although he could not remember her name, he was "good with numbers" and would be able to tell the officers if he recognized it. (Gov. Ex. 2 KT at 18:00-19:00).

station to review the text messages and analyze the phone, and Hutchinson agreed.[15]

(Gov. Ex. 2 KT at 27:40-29:27).   Specifically, the exchange was as follows:

| | |
|---|---|
| Detective Kennedy: | We want to take the phone . . . you've already let us know there's nothing in the phone . . . but not necessarily take the phone, you can get it back. |
| Sergeant Brown: | Here's the thing.  We can do this real quick. I hate that you don't have a car because we're not arresting you or anything. But, um, what we'd like to do – I mentioned how we can sit down with you and show you the text messages to help you refresh your memory. |
| Hutchinson: | I'll ride as long as I can get back to the house. You feel me? |
| Detective Kennedy: | If that's what you want to do, we can do that. |
| Hutchinson: | [Unintelligible] |
| Sergeant Brown: | Yeah.  We can sit down and go over the text messages.  If you don't mind, we'll borrow your phone as well.  We can clear it up real quick.  We have a little device to analyze it. |

_____

[15] Detective Kennedy testified that at this point, the officers took Hutchinson's phone away from him, and he did not return the phone to Hutchinson for the car ride to the police station "for safety reasons and safety reasons only."  (Tr. at 54). Although Hutchinson asked for the phone during the ride, he said he only wanted it to listen to music, so Detective Kennedy gave him an iPod instead.  See (id.); see also (Gov. Ex. 2 KT at 34:49-35:35 (Hutchinson requesting his phone, and Detective Kennedy joking, "You aren't going to call in any scud missiles are you?" before telling Hutchinson that "to be honest he is not supposed to have a phone in the car with [them]" and offering to let Hutchinson have his iPod if he wants to listen to some music)).

|  | That'll get cleared up real quick as well.  But we already have the text messages anyway so that's no big deal.  See, you probably deleted the picture anyway so your sister wouldn't see it, which is a good thing for you to do.  So like I said, nothing to . . . You know we'll sit down with you and clear this up.  Does all that sound okay with you?  You're not under arrest. |
| Hutchinson: | I'm not going nowhere without the phone so if you take the phone you can take me with you.  That's all I'm saying. |
| Detective Kennedy: | If you want to go, you can go. |
| Hutchinson: | 'Cause I don't want to be responsible for the phone. 'Cause I don't wanna . . . |
| Sergeant Brown: | You aren't under arrest.  We'll just give you a ride to DeKalb County.  And the only reason is so that we can sit down and read the text message with you. |

* * *

| Hutchinson: | Y'all gonna bring me back? |
| Detective Kennedy: | Yep.  I don't have a choice.  If I take you, I gotta bring you back. |
| Hutchinson: | Say no more. See I'll ride.  I want to get out of the house anyway.  I'm stuck up here. |

(Id.).  When they left the residence, Hutchinson rode with Detectives Kennedy and Miller in Detective Kennedy's car because he did not have a vehicle.  (Tr. at 32-33).

Detective Kennedy was driving a car that did not have bars or a cage.  (Tr. at 32).

Detective Kennedy patted Hutchinson down before letting him into his vehicle.  (Tr.

at 35).  Hutchinson sat in the back seat and was not handcuffed.  (Tr. at 33-35).  In

fact, he made himself comfortable in the back seat, even laying down across it at one

point and listening to music on Detective Kennedy's iPod. (Tr. at 35); <u>see also</u> (Gov.

Ex. 2 KT at 34:49-35:35).  During the ride, Detective Kennedy did not ask Hutchinson

any questions about the cell phone or communicating with girls, but did explain

again what the officers knew about the case so far and what they wanted to do with

respect to the phone, saying, "What we want to do is just analyze the phone and get

a written statement from you."  (Gov. Ex. 2 KT at 37:40-37:48); <u>see also</u> (Tr. at 35).

When they got to the police station, Hutchinson, Detective Kennedy, and

Detective Miller went to the conference room, which is a large room with no locks

that is surrounded mostly by glass.  (Tr. at 36).  Hutchinson was not taken to an

interrogation room, nor was he handcuffed.  (<u>Id.</u>).  Detective Kennedy made it clear

that  Hutchinson could leave if he chose.  (<u>Id.</u>).  When they got settled, Detective

Kennedy once again explained what he wanted and Hutchinson again agreed to

cooperate.  Specifically, the exchange went as follows:

> Detective Kennedy:      As I told you before, basically I want to copy
> the contents of the phone – what's stored on
> it, pictures, text messages, and things of that
> nature.   But I have to do it with your

13

permission.  I appreciate your cooperation.
You don't have to do this.  It's all up to you.
But it makes a lot of sense for you to.

Hutchinson:            I want to get to the bottom of it too, so I can
know some [expletive].  You know what I
mean.

(Gov. Ex. 2 SVU at 0:50-1:12).  Detective Kennedy then filled out the consent form

and gave it to Hutchinson to review.  (Gov. Ex. 2 SVU at 1:12-3:35).  Without

inquiring about Hutchinson's level of education,[16] Detective Kennedy began to read

the form to Hutchinson, saying:

I, Tremain Jamil, right, Hutchinson, residing at the address . . . having
hereby been informed of my right to refuse to give consent to search,
hereby authorize DeKalb County Police Detective Kennedy to conduct
a search of my cell phone, including any containers of any kind located
at, which is here, 1960 West Exchange Place.  And the bottom is the
information in reference to . . . the above named officers are authorized
by me to seize and take custody . . .

(Gov. Ex. 2 SVU at 3:35-4:17); see also (Tr. at 56).  At that point, Hutchinson

interrupted Detective Kennedy, telling him that he had already read the form.  (Id.);

see also (Tr. at 38).  Detective Kennedy apologized and asked Hutchinson to sign the

consent form.  (Gov Ex. 2 SVU at 4:17-4:40).  Hutchinson signed the form, which was

---

[16]  Detective Kennedy testified, however, that Hutchinson "felt quite
comfortable exerting his knowledge of the law to [him] telling [him] that he had
family in the legal field and that he knew what his rights were."  (Tr. at 56).

14

dated April 5, 2012.  (Tr. at 38-39); see also (Gov. Ex. 1).  After Hutchinson executed the form, Detective Miller took the phone to another officer to analyze it.  (Tr. at 39).

After sending the phone to be analyzed, Detective Kennedy continued to talk to Hutchinson about the case,[17] describing the development of the investigation.[18] Throughout the conversation, he encouraged Hutchinson to continue speaking with him, see, e.g., (Gov. Ex. 2 SVU at 15:30-16:00, 17:03-17:10, 26:50-27:18, 28:45-29:00), and at one point during the conversation when Hutchinson expressed concern about what would happen to the person who had done the things Detective Kennedy was describing, Detective Kennedy told Hutchinson that cyberbullying was not a crime, (Gov. Ex. 2 SVU at 48:46-49:18).  Midway through the approximately two-hour interview, Detective Kennedy asked Hutchinson what he thought would happen when Detective Kennedy got the results from the search warrant that had been issued to T-Mobile regarding the cell phone, and speculated that numerous cases

---

[17] Initially, Detective Miller returned to the conference room after delivering the cell phone to the analyst, but left after Hutchinson "got uncomfortable with her being there [because she was a woman] and asked her to leave."  (Tr. at 39-40).  Sergeant Brown briefly entered the interview room on occasion.  See, e.g., (Gov. Ex. 2 SVU at 59:00)

[18] During this conversation, Detective Kennedy described the investigators' initial impressions of the investigation, including their doubts that extortion could be committed when the alleged extorter did not know who VN1 really was or where she lived, and the possibility that VN1 was lying because she had been caught with inappropriate pictures.  (Gov. Ex. 2 SVU at 12:20-12:44, 25:50-26:50).

would be developed from the information he received.  (Gov. Ex. 2 SVU at 47:25-48:31).  Hutchinson responded, "I probably shouldn't have signed that paper," and Detective Kennedy replied, "I'm not worried about your phone.  You phone's the least little bit."  (Id.); see also (Tr. at 56-57).  He explained that, in responding to the search warrant, T-Mobile was going to capture all of the communications Hutchinson had made using the phone, even the information that Hutchinson had deleted.  (Gov. Ex. 2 SVU at 47:25-48:31).  Detective Kennedy testified that he told Hutchinson he was not worried about the phone so that Hutchinson would "relax his mind about the phone," and because he "didn't want [Hutchinson] to get irritated or agitated about it."  (Tr. at 60).

Throughout the conversation, Detective Kennedy outlined the investigation for Hutchinson.  (Gov. Ex. 2 SVU at 12:00-16:50, 25:50-26:45).  Hutchinson expressed concern that his mother would find out about the investigation and asked how he could keep that from happening.  (Gov. Ex. 2 SVU at 41:10-41:15, 56:03-56:13).  Hutchinson told Sergeant Brown, "I'm trying to be [honest], because I don't want this [expletive] to escalate."  (Gov. Ex. 2 SVU at 59:10 -59:14).  Several times during the interview at the police station, Hutchinson made clear that he was speaking to the police of his own volition.  See, e.g., (Gov. Ex. 2 SVU at 26:55-27:14, 39:56-40:05, 48:44-48:55).  In one exchange, Detective Kennedy said, "I don't want you to think I'm

holding you here against your will," and Hutchinson responded, "No, you're not. I'm here on my own.  I want to make that clear.  Y'all watching.  I'm here on my own."  (Gov. Ex. 2 SVU at 1:10:19-1:10:40).

At the conclusion of the interview, Detective Kennedy told Hutchinson that he needed to go to another building to get his phone for him.  (Gov. Ex. 2 SVU at 1:52:57-1:53:20).  Hutchinson asked if he could go outside to smoke while he was waiting, and Detective Kennedy said yes.  (Id.).  When Detective Kennedy went to retrieve the phone, he was informed that the analysis had revealed child pornography on the phone.  (Tr. at 42).  As a result, Detective Kennedy told Hutchinson that he could not return the phone to him.  (Id. (Detective Kennedy testifying that he could not return the phone because he "felt it would be a criminal act . . .to provide contraband back to [Hutchinson . . . by] basically giving him child pornography which is illegal to have")).  Hutchinson told Detective Kennedy that he needed some numbers out of the phone and said that he would call Detective Kennedy to get those numbers.  (Id.).  Hutchinson then finished his cigarette, and Detective Kennedy drove him to his uncle's apartment, stopping on the way to get a meal from McDonald's.  (Tr. at 43).

17

**B.**   **Facts Related to the Identifications**

**1.**   *The First Photo Array*

On February 18, 2012, Detective Jessica Raley ("Detective Raley") of the Forest

Park Police Department began an investigation into complaints by J.H., a minor, that

she had received text messages from an individual, "Quan," demanding that she

pose naked on the Internet and threatening harm to her and her family if she did

not.[19]  (Tr. at 79-80, 105).   J.H. also reported that "Quan" had come to an address

where she and D.P., another female minor, were, and that D.P had gone with him in

the car.  (Tr. at 80, 105).   After they returned, "Quan" told J.H. to also get in the car

and drove them to another street in Forest Park were he raped J.H. and forced her to

perform oral sex on him.  (Tr. at 80-81, 105-06).   After speaking with J.H., Detective

Raley prepared a photographic lineup that included a photograph of Xavier Reed

("Reed"), because a fellow police officer knew Reed to use the nickname "Quan," and

Reed lived in the Forest Park area.[20]  (Tr. at 81-82, 108).   That day, she showed the

lineup to J.H., who did not identify anyone.  (Tr. at 82, 109, 114).

---

[19] Detective Raley was unaware of the DeKalb County investigation being
conducted by Detective Kennedy.

[20] There was no overlap among the photos used in this lineup and the photos
used to create the later lineups.  (Tr. at 109).

18

On February 22, 2012, Detective Raley showed a single photograph to J.H. of another individual who used the name "Quan" on the Internet because J.H. and D.P. had told her they met "Quan" on Tagged, an Internet website.  (Tr. at 80, 82-83, 109-10); see also (Def. Ex. 1).  This individual was not Hutchinson.  (Tr. at 83).  Detective Raley asked J.H. if the person depicted in the photograph was "Quan" and she said yes.  (Tr. at 83); see also (Tr. at 110 (Detective Raley clarifying on cross-examination that J.H. did not say that the individual was the "Quan" who raped her, but just stated, "That is 'Quan'")).   Detective Raley did not conduct any follow-up investigation with regard to this individual because she was unable to develop any additional information regarding him.   (Tr. at 83).   Rather, she continued the investigation by obtaining the records for the telephone number that  J.H. and D.P. had told her they were communicating with, and then determined that the telephone number was linked to Reynolds, who had been logged as a family member and visitor of Hutchinson at the Clayton County jail during a prior incarceration.  (Tr. at 83-84).  Detective Raley then obtained a black-and-white driver's license photo of Hutchinson and used it to prepare another photographic lineup.  (Tr. at 84, 91); see (Gov. Exs. 5-A to 5-I).

In preparing the photographic lineup, Detective Raley noted that Hutchinson was a black male with unkempt hair and facial hair, wearing "a different style t-

shirt." (Tr. at 89). Accordingly, she searched her computer files and selected eight black-and-white images of black males whose complexions, hair, facial hair, and clothing were similar to each other and to Hutchinson so that "nobody stood out more than anyone else." (Id.); see also (Tr. at 91). Each photograph Detective Raley selected was the same size as the others, each photograph was of a black male with facial hair, and the majority of the men depicted appeared to have hair that was short, unbraided, and unkempt. (Tr. at 95-97, 111). But see (Tr. at 111 (pointing out on cross examination several individuals from the lineup who may not have "unkempt" hair)). The men had similar complexions, none wore jewelry or had tattoos, and all of them were facing forward and had their eyes open with similar facial expressions. (Tr. at 96-97). Because Hutchinson's photo was from a driver's license, his head "appeared larger proportioned to the size of the photo," so Detective Raley "made sure there were other photos that had similar pictures of the head being proportioned largely." (Tr. at 90). Detective Raley did not copy the photographs onto a single sheet of paper, but instead kept them as a series of four by six photographs to minimize the differences between the sizes of each individual's head in the photos so that J.H. "wouldn't obviously see that there were different size heads in the photos." (Tr. at 90-91, 95, 110-11). Each photograph was numbered and

placed into a manilla folder.  (Tr. at 91).  Detective Raley used the same series of photographs with both J.H. and D.P.  (Tr. at 92-93).

Detective Raley met with J.H. to show her the photo lineup on April 25, 2012. (Tr. at 85-86).  Although J.H.'s mom brought J.H. to the police department, Detective Raley met alone with J.H.  (Tr. at 85, 98).  Detective Raley read J.H. a photo lineup advisory statement and a witness identification form, which J.H. also read and stated that she understood.  (Tr. at 85-88); see also (Gov. Exs. 3-4).  The photo lineup advisory form cautioned, among other things, that the group of photographs may or may not contain a picture of the person who committed the crime, that it is just as important to clear innocent persons from suspicion as to identify guilty parties, and that the witness did not have to make an identification.  See (Gov. Ex. 3).  Because the form instructed the witness to pick "one or more persons," Detective Raley clarified the instructions by telling J.H. that if the person of interest was present in the lineup, there would only be one such person.  (Tr. at  87-88).

After the forms were signed, Detective Raley gave the manilla folder with the photographs to J.H. and told J.H. to let her know if she could identify anyone.  (Tr. at 97-98).  When J.H. made it to Hutchinson's photograph, she pulled it out and told Detective Raley, "This is Quan."  (Tr. at 98).  J.H. took less than twenty to thirty seconds to identify Hutchinson; she did not hesitate when she looked at any of the

21

other photographs and she appeared to be very confident in making the identification. (Tr. at 98-99).

Detective Raley showed the same photographic lineup to D.P. on May 29, 2012, at D.P.'s grandmother's home, but she moved Hutchinson's photograph to a different position and renumbered the photographs. (Tr. at 99-101). When D.P. viewed the photo lineup she and Detective Raley were alone. (Tr. at 101). Detective Raley read D. P. a photo lineup advisory statement and a witness identification form identical to those she used with J.H., and she had D.P. read them as well. (Tr. at 101-03); see also (Gov. Exs. 6-7). As she did with J.H., Detective Raley explained to D.P. that she would only be identifying one person if she could, rather than more than one person as stated on the form. (Tr. at 103). After selecting Hutchinson's photograph and comparing it to the others for a minute, D.P. stated that she could not identify anyone. (Id.).

### 2.    *The Second Photo Array*

Special Agents Anthony Scott ("Agent Scott") and Brian Haley ("Agent Haley") of Immigration and Customs Enforcement ("ICE") Homeland Security Investigations, who investigate matters in child exploitation cases and cyber crimes, also testified at the hearing about the identification procedures used with K.H.,

another minor victim in this case.[21]  (Tr. at 115, 122-23).  Agents Scott and Haley

interviewed K.H. at her home on August 15, 2012, in the presence of her parents.  (Tr.

at 118, 123).  During the interview, Agent Scott showed K.H. a photo lineup that he

had prepared using Hutchinson's driver's license photograph.  (Tr. at 116, 123); see

also (Gov. Ex. 8).  In preparing this photo lineup, Agent Scott used black and white

photographs because the background of Hutchinson's photograph was a different

shade than the others and Agent Scott wanted to eliminate any suggestiveness.  (Tr.

at 116-17).   Each of the six photographs was of a black male with similar facial

features: close-cropped hair; facial hair; no teeth showing; a larger, blocked-shaped

head; and no expression.  (Tr. at 117).  All of the individuals were facing forward and

all of the photographs were the same size.  (Id.).

Before showing the lineup to K.H., Agent Scott told her that the man who

raped her may or may not be in the series of photographs, and that if he was in the

lineup she should place her initials and the date next to his photograph.[22]  (Tr. at 118-

19, 124).  Agent Scott could not recall if he had told K.H. that someone else had made

_____

[21] Agent Scott was made aware of the DeKalb County investigation by
Detective Kennedy, and because Detective Kennedy believed multiple victims were
going to be involved, he thought that Agents Scott and Haley's task force should be
involved.  (Tr. at 115-16).  To Agent Scott's knowledge, K.H. and J.H. did not know
each other, go to school together, or live in the same neighborhood.  (Tr. at 120).

[22] ICE does not generally use a photo lineup advisory form like the one used by
Detectives Raley and Kennedy.  See (Tr. at 128).

a positive identification of Hutchinson before she made her selection, but Agent Haley had no recollection of anyone saying this to K.H.  (Tr. at 119, 121-22, 124, 127-28).  K.H.'s parents did not say anything during the procedure and neither her parents nor the agents appeared to be trying to influence K.H. in any way.  (Tr. at 119, 124, 127-28).  Without hesitation, K.H. selected Hutchinson's photograph from the lineup, and she seemed certain in her identification of him.  (Tr. at 119-20, 124).

## II.  DISCUSSION

### A.    Motions to Suppress Statements and Evidence

#### 1.    *Hutchinson's Statements*

Hutchinson asserts that his statements should be suppressed because they were "involuntarily rendered."  [Doc. 49 at 5]; see also [Doc. 23].  Specifically, he asserts that the officers engaged in deceptive behavior by "encourag[ing him] to make statements under the pretense that if he did, it would be better for him," and that they "misle[d Hutchinson] about the significance of any statements he made" in order to "induce him to speak to the officers right then or else things would get worse for him."  [Doc. 49 at 8-9].  He asserts that the misrepresentations continued when Detective Kennedy "downplayed whether criminal charges could be filed against [] Hutchinson."  [Id. at 9-10].  Finally, he asserts that the atmosphere surrounding the encounter was coercive in that Hutchinson was confronted by

armed officers, roused from sleep, told his movement around the residence made the detectives nervous, questioned as he brushed his teeth, and patted down before entering the police vehicle.  [Id. at 10].

Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.   United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)).  "This totality of circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'"   United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police."  Id. (citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement:  "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate

choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345. "Those cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985), modified in unrelated part by 781 F.2d 185 (11th Cir. 1986) (per curiam) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

Hutchinson does not argue that his statement was involuntary because he is of below average intelligence, that he was ever detained or detained for an extraordinary period, that officers used physical force against him, or that the police made any promises to him. See generally [Doc. 49]. Instead, Hutchinson argues that

his statements were not voluntary because officers were deceptive when talking to him.  Although Hutchinson concedes that officers did not deceive him by promising not to prosecute him, telling him that a conversation was confidential, or promising immediate release,[23] he asserts that the "deception took a different form," [id. at 8], in that the officers encouraged him to talk by implying the case could be immediately resolved and attempted to downplay the significance of his statements, [id. at 10].

However, the evidence of record belies Hutchinson's assertions.  First, any suggestion that cooperation may result in speedier release does not constitute sufficient police overreaching or coercion to render a statement involuntary.  Bradley v. Nagle, 212 F.3d 559, 566 (11th Cir. 2000); see also United States v. Rutledge, 900 F.2d 1127, 1128, 1130-31 (7th Cir. 1990) (holding a defendant's statement to be voluntary even though police told him that "all cooperation is helpful").  Moreover,

_____

[23] Indeed, Hutchinson could not successfully make any such argument as the record reveals that Detective Kennedy repeatedly told Hutchinson that he could not tell him what would happen to him and that the outcome would be determined by the court or through the agreement of the parties.  See, e.g., (Gov. Ex. 2 SVU at 36:18-36:45).  Moreover, Detective Kennedy never said that the conversation was confidential, but instead repeatedly told Hutchinson that he would be sharing the results of the investigation with the District Attorney and that he could not guarantee that Hutchinson's parents would not find out.  See, e.g., (Gov. Ex. 2 SVU at 28:56-29:10, 41:10-41:15).  Since Hutchinson was not in custody, there was no issue of his release.  Nor is there any evidence that officers ever told Hutchinson that he could speak to them "off the cuff," implying that his statements would not be used against him.  See United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) (noting that the term "off the cuff" would have been interpreted by a suspect to mean that anything he said would not be used against him).

the recording of the interview makes clear that the officers did not tell Hutchinson that if he confessed, the case would be resolved that day.  See (Gov. Ex. 2 SVU at 28:56-29:10, 36:18-36:45).  Indeed, Detective Kennedy was forthright in answering Hutchinson's questions about what would happen if he confessed to the crime, and the lack of control the officers had over the outcome of the proceedings:

| | |
|---|---|
| Hutchinson: | If I say this is me, what happens? |
| Detective Kennedy: | I put together a case file, and let the district attorney handle it. |

* * *

| | |
|---|---|
| Hutchinson: | You saying, no matter what, this is going to court no matter what? |
| Detective Kennedy: | I'm not saying that no matter what this is going to court.  That depends on you or who was involved in this.  All things don't go to court.  This ends in whatever agreement is made between the district attorney's office, the family, the victim, or whoever's involved.  I don't have anything to do with that.  I'm the case manager. |

(Id.).  Moreover, Hutchinson explicitly told the officers that he was cooperating of his own accord because he wanted to clear his name and did not want the situation to escalate.  See (Gov. Ex. 2 KT at 24:53-25:13 (Hutchinson saying, "Y'all can do whatever you need to do.  As long as you clear my name out of this [expletive], I don't give a [expletive] what you do"); Gov. Ex. 2 SVU at 59:10-59:15 (Hutchinson

28

saying, " "I'm trying to be [honest] because I don't want this [expletive] to escalate"),

1:10:19-1:10:40).

To the extent the officers' attempts to downplay the significance of

Hutchinson's statements amounted to trickery or deception, "it is clear, that the

police's use of a trick alone will not render a confession involuntary." United States

v. Castandeda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984) (citations omitted).

Indeed, "trickery or deceit is only prohibited to the extent it deprives the suspect of

knowledge essential to his ability to understand the nature of his rights and the

consequences of abandoning them." Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir.

2002) (internal marks omitted) (quoting Moran, 475 U.S. at 424); see also Lall, 607

F.3d at 1285-86 (citations omitted) (noting that police misrepresentations of fact are

not enough to render a confession involuntary, but misrepresentations of law are

more likely to do so). Accordingly, "[t]he kinds of deception that are generally

deemed to trigger suppression are lies about a defendant's legal rights (i.e., you must

answer our questions), false promises (i.e., whatever you say will be just between us)

or threats (i.e., if you don't talk, you won't see your family for a very long time)."

United States v. La Forgia, Criminal No. 12-0057-WS-C, 2012 WL 1869035, at *4 (S.D.

Ala. May 22, 2012) (footnote omitted) (citing United States v. Degaule, 797 F. Supp.

2d 1332, 1380 (N.D. Ga. 2011)).

Moreover, cases where police trickery has caused a confession to be involuntary involve "other aggravating circumstances." Castaneda-Castaneda, 729 F.2d at 1363; see also United States v. Middleton, 245 F. App'x 867, 872 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted) (noting that the "single interrogation trick" of lying about the evidence against a defendant, "in the absence of any other aggravating circumstances suggesting coercion on the part of [the police,] does not automatically render [the statement] involuntary"). Since "[c]oercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary,'" see Colorado v. Connelly, 479 U.S. 157,167 (1986), the aggravating circumstances generally must show that the police exerted such pressure on a defendant that his "will is overborne and his capacity for self-determination critically impaired," Martin, 770 F.2d at 926; compare also, e.g., Spano v. New York, 360 U.S. 315, 321-22 (1959) (finding confession involuntary where defendant was foreign-born, had only one-half year of high school education, and had a history of emotional instability and was subjected to late-night questioning which included police trickery); Robinson v. Smith, 451 F. Supp. 1278 (W.D.N.Y. 1978) (finding confession involuntary where defendant with a fifth-grade education was questioned all night, was not told of his constitutional rights, was misleadingly informed he would benefit by confession, and was presented with a false confession by his accomplice), with

<u>Frazier v. Cupp</u>, 394 U.S. 731, 737-39 (1969) (finding statement voluntary despite the fact that police lied to defendant about his co-defendant's statement because the questioning was of short duration and the defendant was a "mature individual of normal intelligence"); <u>United States v. Anthony</u>, Criminal Case No. 1:11-CR-0326-SCJ-JFK, 2012 WL 684844, at *6 (N.D. Ga. Jan. 20, 2012), adopted by 2012 WL 684802, at *1 (N.D. Ga. Mar. 2, 2012) (finding statement voluntary despite the fact that the agents were not truthful with defendant about the reason for the interview where the atmosphere was cordial, the agents did not use any force or draw their weapons, the agents did not make defendant any promises or threaten him, and defendant never asked for a lawyer or told the agents he did not want to speak to them); <u>Edwards v. McNeil</u>, No. 3:09-cv-575-J-20JRK, 2011 WL 98407, at *6 (M.D. Fla. Jan. 12, 2011) (finding statement voluntary despite false statements and a palm print prop used to encourage defendant to talk where defendant was an adult with a GED and a full time job who was clear of mind and familiar with his legal rights, the interview took place in a regular interview room without any attempt by the officers to create a threatening atmosphere).

Hutchinson asserts that the police misled him by: (1) telling him that if he had unknowingly engaged in sexual communication with minors, they could deal with it "right now," [Doc. 49 at 9 (<u>citing</u> (Gov. Ex. 2 KT at 9:47-11:02, 12:41-12:54))], (2) by

telling him that they did not think that "it was that big of a deal" and that they thought he was "making it bigger than what it is," [id. at 10 (citing (Gov. Ex. 2 KT at 20:44-20:56))], (3) telling him that it was not their purpose to lock him up, [id. (citing (Gov. Ex. 2 SVU at 25:21-25:34))], (4) telling him that "when we're done, I'm going to take you home but remember the conversation will not be the same later," [Doc. 49 at 9 (citing (Gov. Ex. 2 SVU at 26:55-25:34))], (5) asking him how VN1 could be extorted if the person who was extorting her did not know who she was or where she lived, [id. (citing (Gov. Ex. 2 SVU at 12:20-12:44))], and (6) telling him that cyberbullying was not a crime, [id. at 11 (citing (Gov. Ex. 2 SVU at 48:46-49:18))]. To the extent these statements even constitute misrepresentations,[24] statements (1) through (5) are simple misrepresentations of fact that, without more, do not render Hutchinson's statements involuntary.   See Lall, 607 F.3d at 1285-86 (citations omitted).

_____

[24] With respect to statements (3) and (4), the record shows that Detective Kennedy, as promised, took Hutchinson to his uncle's home after their conversation ended, see (Tr. at 43), and since he did not arrest Hutchinson that day, it is apparent that his purpose was not simply to "lock him up," but to, as he had repeatedly explained, find the individual who was harassing the minor victims, see, e..g, (Gov. Ex. 2 SVU at 25:10-25:35, 28:20-28:40, 37:17-37:45).  Moreover, statement (5) is not a statement at all, but rather a question posed in passing while describing the detectives' initial impressions of the investigation and the doubts they had about the veracity of the initial complaint that did not in any way impart any misleading or deceptive information to Hutchinson.  See (Gov. Ex. 2 SVU at 12:20-12:44).

While Hutchinson claims that statement (6) constitutes a misrepresentation of the law that would "deprive[ Hutchinson] of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them" by misleading him about the potential illegality of his actions, Soffar, 300 F.3d at 596 (citation and internal marks omitted); see also Lall, 607 F.3d at 1285-86 (citations omitted), Detective Kennedy did not misrepresent the law by making this statement as there are no federal or Georgia laws criminalizing cyberbullying.  See, e.g., Williams, Jamie L., Teens, Sext, & Cyberspace: The Constitutional Implications of Current Sexting & Cyberbullying Law, 20 Wm. & Mary Bill Rts. J. 1017, 1039 (Mar. 2012) (discussing failed federal attempts to criminalize cyberbullying); South, Rachel M., House Bill 310: The End to Cyberbullying Act, 6 J. Marshall L. J. 417, 417 (Fall 2012) (discussing proposed, but not enacted, Georgia cyberbullying legislation that would not criminalize general cyberbullying, but instead would give schools the authority to regulate on- and off-campus cyberbullying).[25]

---

[25] In addition, it is clear from the remainder of the interview that Hutchinson was not misled by this comment to understand that he could not face any criminal charges as a result of the photographs.  Hutchinson volunteered that he had been in trouble for sexual activity with an underage girl before, and was clearly aware throughout the interview of the potential legal consequences of possessing photos of underage girls engaged in sexual acts.  See, e.g., (Gov. Ex. 2 SVU at 44:20-45:02, 1:18:45-1:20:10); see also (Gov. Ex. 2 SVU at 1:33:10-1:33:40 (Detective Kennedy explaining that the potential legal consequences depend on how the rest of the investigation develops)).

Moreover, despite Hutchinson's contentions, see [Doc. 49 at 10], no other aggravating circumstances are present that render the environment in which Hutchinson spoke with police coercive, see Middleton, 245 F. App'x at 872; Castaneda-Castaneda, 729 F.2d at 1363.  Although, as Hutchinson points out, there were five armed officers present at the house, only Detective Kennedy and Sergeant Brown were "in close proximity" to Hutchinson during questioning,[26] (Tr. at 32 (Detective Kennedy testifying that the officers were not "overshadowing him or crowding him, nothing of that nature")), and as Hutchinson himself admits, the officers never drew their weapons or threatened him, [Doc. 49 at 10].  Moreover, despite the fact that Detective Kennedy was uncomfortable with Hutchinson moving about the apartment, Hutchinson's movements were not constrained.  See (Tr. at 52-53).  Indeed, Hutchinson moved about the apartment throughout the interview, and was permitted to go to the bathroom, brush his teeth, put on his pants, and retrieve the ringing phone from across the room.  (Tr. at 32, 53-54).  Although Detective Kennedy patted Hutchinson down out of concern for officer safety before letting him into the car, Hutchinson was not handcuffed or restrained in any way at any point during their conversations.  (Tr. at 33-35).  In addition, Hutchinson's interview, which took only about two hours, took place not in a private interrogation room, but

---

[26] The two officers from Cobb County were either outside or at the front door, and Detective Miller was in the kitchen.  (Tr. at 32).

in an open, glass-walled conference room.  (Tr. at 35-36, 40). In short, Hutchinson has

not identified, nor does the record reveal, any aggravating circumstances creating a

coercive environment which would cause the officers' use of any trickery to render

Hutchinson's statement involuntary.  Cf. Martin, 770 F.2d at 925 (finding statement

voluntary even though it came after a five-hour interrogation in which one detective

raised his voice at the defendant, cursed at him, discussed the death penalty, lied to

him by stating a co-defendant had confessed, ignored his request to suspend

questioning until the next day, and falsely assured him that the truth could not hurt

him); see also Frazier, 394 U.S. at 737-39; Anthony, 2012 WL 684844, at *6; Edwards,

2011 WL 98407, at *6.  Accordingly, it is **RECOMMENDED** that Hutchinson's

motion to suppress statements, [Doc. 23], be **DENIED**.

     **2.**    *Evidence from Hutchinson's Cell Phone*

     Hutchinson asserts that the evidence obtained from the seizure and search of

his cell phone should be suppressed because the consent he gave to search the phone

was involuntary.  [Doc. 49 at 11-14].  Specifically, he contends that the consent was

invalid because the consent  form was signed after the phone had been seized by the

detectives, [id. at 12-13], and because Detective Kennedy did not read the entire

consent form to Hutchinson, "it is not clear from the record whether [] Hutchinson

. . . read the entire [consent] form or [] understood what he was agreeing to, [id. at

14].[27]   In addition, Hutchinson asserts that even if the Court finds his consent to search the phone was valid, the search exceeded the scope of the consent that he gave because no officer explained that a forensic search of the phone would occur and Hutchinson was under the impression that the phone would be returned to him, [id. at 13-14].

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989) (citations omitted); see also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Reynolds, 526 F. Supp. 2d 1330, 1336-37 (N.D. Ga. 2007). "[W]here the validity of a search rests on

_____

[27] Hutchinson also contends that he attempted to withdraw his consent during the interview and that Detective Kennedy misled him by saying in response that the phone was "not an issue." [Doc. 49 at 14]. Review of the recorded interview shows that in discussing Detective Kennedy's suspicions that Hutchinson was the perpetrator and the information that could come from the pending subpoena with T-Mobile for the phone's complete records, Hutchinson stated, "I probably shouldn't have signed that paper then," and Detective Kennedy responded that the information actually on the "phone was the least little bit" because "T-Mobile keep [sic] all the data." (Gov. Ex. 2 SVU at 46:30-48:40). In context, Detective Kennedy's statements were not misleading, and in fact fully explained the scope of the investigation and evidence that would be compiled from various investigative sources. Moreover, Hutchinson's statement that he "probably shouldn't have signed [the consent form]," does not amount to the "unequivocal act or statement of withdrawal" needed to withdraw consent to search, United States v. Diaz, No. 03-20895-CR, 2004 WL 5589592, at * (S.D. Fla. May 3, 2004), adopted by 2004 WL 5589590, at *1 (S.D. Fla. May 24, 2004) (quoting United States v. Ross 263 F.3d 844, 846 (8th Cir. 2001); United States v. Martel-Martines, 988 F.2d 855, 858 (8th Cir. 1993); United States v. Alfaro, 935 F.2d 64, 67 (5th Cir. 1991)).

consent, the [government] has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995) (first alteration in original) (internal marks omitted) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Id. (quoting Garcia, 890 F.2d at 360). Furthermore, "[t]he voluntariness of the consent must be judged in the light of the totality of the circumstances." Id. at 1535 (citing Schneckloth, 412 U.S. at 227); see also United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002) (alterations, citation, and internal marks omitted) ("In determining the voluntariness of a defendant's consent, . . . a court must look at several factors, which include whether the defendant was free to leave, whether there was coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse to consent, whether the defendant could refuse to consent, the extent of the defendant's education and intelligence, and the defendant's belief that no incriminating evidence would be found.").

First, the totality of the circumstances here show that Hutchinson's written consent was voluntary and not the product of coercive police procedures. As

previously discussed, nothing about police procedure in this case was coercive: although five officers were present at the apartment, only two were in close proximity to him during the approximately 30 minutes of questioning and no officer ever drew his or her weapon, threatened Hutchinson, or physically touched him in any way, with the exception of a brief pat down for officer safety before he got in the car. (Tr. at 32); [Doc. 49 at 10]; see also United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007) (finding consent voluntary where, *inter alia*, the officers did not point their guns at defendant); Hudson v. Hall, 231 F.3d 1289, 1290 (11th Cir. 2000) (finding consent voluntary where, *inter alia*, officer was not verbally abusive). Once at the station, the officers did not use any force, threats, or promises to get Hutchinson to give consent, (Tr. at 21); see also United States v. Weeks, 666 F. Supp. 2d 1354, 1375-77 (N.D. Ga. 2009) (finding consent voluntary where, *inter alia*, "agents did not make any threats or promises to induce [the suspect] to consent"), and Hutchinson was placed in an open, glass-walled conference room with only two officers present at the time he was presented with the consent form,[28] (Tr. at 35-36, 40). Hutchinson was cooperative during the encounter, voluntarily scrolling through photographs on the phone, see (Gov. Ex. 2 KT at 13:24-13:26), explaining his habit of exchanging

---

[28] In addition, when Hutchinson later in the approximately two hour interview expressed discomfort about the presence of the female officer, Detective Miller, she left to accommodate his request. (Gov. Ex. 2 SVU at 30:40-40:00).

photographs with women,[29] see, e.g., (Gov. Ex. 2 KT at 10:42-13:27), volunteering that he had previously been arrested for his interaction with an underage girl, see, e.g., (Gov. Ex. 2 SVU at 1:18:45-1:20:10), and reiterating that he was there and cooperating of his own accord, see, e.g., (Gov. Ex. 2 SVU 26:55-27:14, 39:56-40:05, 48:44-48:55, 1:10:19-1:10:40, 1:33:40-1:33:55).

In addition, since Hutchinson invited the officers into his apartment, his movements were never restricted, he was never handcuffed, he willingly accompanied the officers to the police station in a car with no bars or cage, and he was never even placed in an interrogation room, it is clear that he voluntarily went to the police station with the officers and was free to leave at any time. (Gov. Ex. 2 KT at 2:18-2:23, 27:40-29:17 (Hutchinson expressing pleasure at going down to the police station because he wanted to get out of the house)). Moreover, despite Hutchinson's contentions otherwise, see [Doc. 49 at 14], the record shows that he was aware that he did not have to consent to the search of his phone. Although Hutchinson stopped Detective Kennedy from reading the entire consent to search form verbatim, Detective Kennedy explicitly told Hutchinson that he could not search the phone without Hutchinson's permission. (Gov. Ex. 2 SVU at 0:50-1:12).

---

[29] In fact, while discussing this habit, Hutchinson shared that he routinely deleted the photographs and text messages he received from women, making it clear that he did not believe officers would find any incriminating evidence on the phone. (Gov. Ex. 2 KT at 17:48-18:11, 22:49-23:03).

In addition, Hutchinson had previously informed Detective Kennedy that he was aware of his rights and had persons with legal knowledge in his family, (Gov. Ex. 2 KT at 16:00, 38:00-38:50; Gov. Ex. 2 SVU at 3:34-4:17), and he specifically told Detective Kennedy that he had read the form, (Gov. Ex. 2 SVU at 3:35-4:17); see also (Tr. at 56). Furthermore, there is no evidence that any agent made any threats, promises, or misrepresentations[30] to Hutchinson in order to persuade him to consent to the search.  Under these circumstances, Hutchinson's written consent appears from all the evidence to have been voluntary, not the product of undue police coercion.  In fact, the circumstances presented in this case are far less coercive than circumstances in which consent has been found voluntary, especially in light of the fact that Hutchinson was not under arrest, nor was he threatened with arrest, at the time he gave the consent to search.  Cf. United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (holding consent voluntary where the defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); Garcia, 890 F.2d at 361 (holding consent

---

[30] Although Hutchinson contends that the officers lied by telling him that his phone would be returned to him after the search, see [Doc. 49 at 14], the record makes clear that Detective Kennedy attempted to retrieve the phone and return it to Hutchinson at the conclusion of the interview before taking him home, (Gov. Ex. 2 SVU at 1:48:58-1:49:06, 1:52:57-1:53:20), and Detective Kennedy did not become aware of the fact that he could not legally return the phone to Hutchinson until he was informed that the phone contained contraband in the form of child pornography, (Tr. at 42).

voluntary despite officers' refusal to accept suspect's conditional consent to search and threats to obtain a search warrant if the suspect did not consent to a full search); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers asked for consent to search, stating that, if refused, they would return and "dig the place up"); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn).

Furthermore, the additional objections regarding the timing and scope of the consent that have been raised by Hutchinson are without merit.  Although he asserts that the phone was seized before he signed the consent to search form, [Doc. 14 at 12-13], the facts developed at the evidentiary hearing establish that officers sought and received Hutchinson's verbal consent in the non-coercive circumstances previously described before each action they took with respect to his phone while at the apartment.  See, e.g., (Gov. Ex. 2 KT at 12:15-12:35 (Detective Kennedy asking upon discovery of the phone if he can see it, and Hutchinson agreeing), 13:24-13:26 (Hutchinson volunteering to show Detective Kennedy "every picture in the phone"), 22:50-23:10 (Sergeant Brown asking Hutchinson to go to his contacts, and Hutchinson agreeing by doing so), 24:40-24:52 (Sergeant Brown asking Hutchinson to go back to

his contacts because he hit the wrong button, and Hutchinson agreeing by doing so));
see also (Tr. at 31, 54 (Detective Kennedy testifying that although he took the phone
from Hutchinson during their conversation, he gave it back to him even after he had
seen the pictures, and that Hutchinson "had access to the phone, and he was actually
trying to show [the officers] how to use the website he was using on his phone")).
As a result, there was no "meaningful interference with an individual's possessory
interest in that property," United States v. Jones, 132 S.Ct. 945, 951 n.5 (2012) (citation
and internal marks omitted), at the apartment, since Hutchinson maintained control
of the phone while the officers were at his home.

Although the officers did seize Hutchinson's phone by taking it from him and
holding onto it while they were riding to the police station, see id., they did so only
after Hutchinson had agreed to accompany the officers to the police station where
they could have the phone analyzed, see (Gov. Ex. 2 KT at 27:40-28:47).  To the extent
this agreement did not constitute consent for an officer to hold his phone during the
ride, see, e.g., (Gov. Ex. 2 KT at 34:49-35:35 (Hutchinson requesting his phone during
the car ride to listen to music)), Detective Kennedy explicitly testified that he did not
return Hutchinson's phone to him while he was in the car for "safety reasons," (Tr.
at 54); see also (Gov. Ex. 2 KT at 34:49-35:35 (Detective Kennedy explaining to
Hutchinson that it was police policy to not let him keep his phone while riding with

the officers)), and an officer is permitted to temporarily seize property in an effort to ensure officer safety, see, e.g., United States v. Patel, No. 2:08-CR-210-WKW, 2010 WL 742983, at *2 & n.7 (M.D. Ala. Feb. 26, 2010) (citing United States v. Bishop, 333 F.3d 623, 626 (6th Cir. 2003)).  Moreover, the phone remained in the vehicle with Hutchinson, though not in his possession.  Upon arriving at the police station, Detective Kennedy specifically asked Hutchinson for permission to search the phone, informing him that he "has to [search the phone] with [Hutchinson's] permission," and he "appreciated [his] cooperation" because he "[didn't] have to do this" and it was "totally up to [him]" whether or not they went forward, (Gov. Ex. 2 SVU at 1:00-1:10), once again giving Hutchinson the ability to control whether or not and to what extent the officers investigated the information contained on the phone.

Moreover, the scope of the search of the phone did not exceed the scope of Hutchinson's consent.  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  Florida v. Jimeno, 500 U.S. 248, 251 (1991) (citations omitted).  Here, with respect to the search of Hutchinson's phone, Sergeant Brown specifically explained before they ever left Hutchinson's apartment that the police would search the phone with "a little device" that would "analyze it," (Gov. Ex. 2 KT at 28:15-

28:43), and Detective Kennedy later explained that he wanted "to copy the contents

of the phone–what's stored on it, pictures, texts, messages, and things of that nature,"

(Gov. Ex. 2 SVU at 0:50-1:12).   In light of these exchanges, it is clear that a reasonable

person would have understood that anything stored on the phone was included in

the scope of the search, and the undersigned does not find that the search which took

place exceeded these limitations.   As the Court therefore finds that Hutchinson's

consent to search the cell phone was voluntary, it is **RECOMMENDED** that

Hutchinson's motion to suppress evidence, [Doc. 25], be **DENIED**.

**B.**   **Motion regarding Identifications**

Hutchinson moves to prevent witnesses in this case from making an in-court

identification and to suppress the out-of-court identifications they provided,

asserting that the identification processes used were unduly suggestive and create

a substantial risk of misidentification, tainting any subsequent identifications.  See

[Doc. 21 (citing Foster v. California 394 U.S. 440, 442 (1969))].  The Supreme Court has

developed a two-part test to review an out-of-court identification.   "First, we ask

whether the original identification procedure was unduly suggestive." United States

v. Brown, 441 F.3d 1330, 1350 (11th Cir. 2006); see also Manson v. Brathwaite, 432

U.S. 98, 106-07 (1977).  If so, "we must then determine whether the suggestive

procedure, given the totality of the circumstances, created a substantial risk of

irreparable misidentification at trial." Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987) (citations omitted); see also United States v. Smith, 459 F.3d 1276, 1294 (11th Cir. 2006) (alteration and citation omitted) ("The court must first decide whether the procedure was impermissibly suggestive, and if it was suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification."); Brown, 441 F.3d at 1350 (internal marks omitted) (quoting United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001)) (noting that if the lineup is unduly suggestive "we then consider whether, under the totality of the circumstances, the identification was nonetheless reliable"). "Under this analysis, 'reliability is the linchpin in determining the admissibility of identification testimony.'" Williams, 826 F.2d at 1018 (quoting Manson, 432 U.S. at 98). Hutchinson bears the initial burden of proving that the identification procedure was unduly suggestive, and if he is successful, the burden then shifts to the government to prove that the identification was reliable in spite of the suggestive procedure. United States v. Wade, 388 U.S. 218, 240 n.31 (1967).

In evaluating the suggestiveness of a photographic array, courts consider the size of the array, the manner of its presentation by law enforcement officers, and the details of the photographs themselves. See United States v. McNeill, Criminal No. 06-373, 2007 WL 2234516, at *4 (W.D. Pa. Aug. 2, 2007) (citing United States v.

Wiseman, 172 F.3d 1196, 1208-09 (10th Cir. 1999)); United States v. Rosa, 11 F.3d 315,

330 (2d Cir. 1993)).  A defendant in a lineup does not have to be surrounded by

others identical in appearance, and a lineup is not unduly suggestive merely because

the defendant's photograph can be distinguished from others.  See Cikora v. Dugger,

840 F.2d 893, 896-97 (11th Cir. 1988) (district court did not clearly err by admitting

identification where only defendant's photograph in lineup had height markings in

background and defendant was a different race than several other subjects); Watson

v. Harrison, No. CV 06-3626-SJO (JCR), 2008 WL 2163940, at *7 (C.D. Cal. May 12,

2008).  But see O'Brien v. Wainwright, 738 F.2d 1139, 1141 (11th Cir. 1984) (color

photograph displayed with five other black-and-white mug shots "stuck out like a

sore thumb").  The Eleventh Circuit and other courts have held that if the subjects in

a lineup have "substantial similarity in facial features, complexion, facial hair, and

general body type and appearance," the lineup is not unduly suggestive.  United

States v. Smith, 148 F. App'x 867, 874-75 (11th Cir. 2005) (per curiam) (unpublished)

(internal marks omitted); United States v. Anderson, 156 F. App'x 218, 220-21 (11th

Cir. 2005) (per curiam) (unpublished); see also United States v. Rose, 362 F.3d 1059,

1066 (8th Cir. 2004) (photographic lineup not unduly suggestive although

defendant's eyes may have appeared closed in his photograph and his hair was

shorter than the rest, where basic physical features of others were consistent with

description provided by witness and generally similar to defendant's features);

United States v. Burbridge, 252 F.3d 775, 780 n.5 (5th Cir. 2001) (that defendant was

the only one in photographic lineup with black t-shirt not impermissibly suggestive);

Harker v. Maryland, 800 F.2d 437, 444 (4th Cir. 1986) (photo array not impermissibly

suggestive where only one other individual wore clothing similar to defendant's

clothing, as identification based more on facial features than clothing); United States

v. Johnson, 56 F.3d 947, 954 (8th Cir. 1995) (photo spread comprised of African-

American men with similar features to the African-American suspect was proper).

### 1.     *The First Photo Array (J.H. and D.P.)*

In his motion to suppress J.H.'s identification, Hutchinson asserts that "[t]he

photo array that Detective Raley showed to J.H. and D.P. is unduly suggestive."

[Doc. 55 at 6].  Hutchinson contends that the photographic array was unduly

suggestive because (1) Hutchinson's head was "much larger" than the heads of all

but one of the eight individuals who's photos were included in the array, and (2) that

the majority of the individuals pictured had hair that was shorter than Hutchinson's

and not unkempt.  [Id.].

However, the objections raised by Hutchinson do not show that the

photographic array was unduly suggestive.  Although Hutchinson contends that his

head is larger and his hair longer and more unkempt than the other depicted

47

individuals, a review of the photographs in the array reveals that Hutchinson's photograph is "sufficiently similar to the others in size, details, and manner of presentation to render it inconspicious." United States v. Henderson, Criminal Case No. 1:11-CR-255-TWT-RGV, 2012 WL 1665870, at *5 (N.D. Ga. Apr. 16, 2012), adopted by 2012 WL 1658698, at *1 (N.D. Ga. May 11, 2012); see also (Gov. Ex. 5-A to 5-I; Tr. at 90-91).  Indeed, contrary to Hutchinson's assertions, the photographs each depict African-American males similar in age and with similar short haircuts and facial hair. See (Gov. Ex. 5-A to 5-I).  Moreover, the admonition form given to J.H. and D.P. before they saw the photographic array specified that "hair styles, beards and moustaches may be easily changed," adequately protecting against undue suggestiveness based on the minor differences in hair length among the photographs. See (Gov. Exs. 3, 6).  Likewise, each photograph is approximately the same size and each depicts a facial shot taken from approximately the same distance consisting of the individual's shoulders, neck, and face.  (Id.).  Because "[a] lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others," Smith, 148 F. App'x at 874 (citation omitted), the alleged minor differences in the photographs do not render the first photo array unconstitutionally suggestive,[31] see United States v. Walker, 199 F. App'x 884, 887 (11th Cir. 2006) (per

_____

[31] Indeed, D.P., who also viewed this photo array, did not make any identification at all, see (Tr. at 99, 103), undermining Hutchinson's suggestion that the

curiam) (unpublished) (affirming district court's finding that array was not unduly suggestive where it included "similar looking African-American males who were similar in complexion and had short hair" and "although there [were] some differences between each photo, nothing unreasonably suggested that [defendant] was the actual suspect in the offense"); Rose, 362 F.3d at 1066. Accordingly, the undersigned finds that the first photo array was not unduly suggestive, and it is **RECOMMENDED** that Hutchinson's motion to suppress identifications, [Doc. 21], be **DENIED** with respect to the first photo array.

### 2.    *The Second Photo Array (K.H.)*

In support of his motion to suppress K.H.'s identification, Hutchinson asserts that "the photo array that [Agent Scott] showed to K.H. is unduly suggestive." [Doc. 55 at 7]. Hutchinson contends that the photographic array was unduly suggestive because (1) only one of the other males in the array has thick/heavy facial hair similar to Hutchinson's, but his hair is braided; (2) Hutchinson's hair is unkempt; and (3) Hutchinson appears to be the smallest person in the array. [Id.]. Hutchinson also apparently contends that the procedures used were suggestive, asserting that "[Agent] Scott testified that at the time K.H. looked at the photo array, he could not

---

array somehow drew attention to his photograph or suggested that he was the perpetrator.

recall if he told her that someone else had identified the person in photo number 6."
[Id.].

The objections raised by Hutchinson to the photo lineup do not show that it was unduly suggestive. Indeed, despite Hutchinson's protestation that the only other individual in the lineup with thick or heavy facial hair had braids, distinguishing him from Hutchinson, a review of the photographs shows that all the individuals depicted had some facial hair and that, in fact, two other individuals, number three and number four, had heavy facial hair, and thus any differences are not unduly suggestive. See (Gov. Ex. 8); see also Cikora, 840 F.2d at 897 (providing that a photographic array was not unduly suggestive where "[a]ll the men depicted had some facial hair" even though the defendant's "moustache in the picture [was] sparse"). Furthermore, a review of the photographs shows that Hutchinson appears to have hair the same length as the men in photographs three and four. See (Gov. Ex. 8). Moreover, as all of the men depicted have short, close-cut hair and the photographs all depict only the head and neck of the suspects, it is impossible to say whether Hutchinson's hair is "unkempt" or whether he is "smaller" than any of the other men in the array. See (id.).

In sum, the Court finds that the photographic array, consisting of six black and white photographs of African-American males, is not unduly suggestive because

Hutchinson's photograph is "sufficiently similar to the others in size, details, and manner of presentation to render it inconspicuous." Henderson, 2012 WL 1665870, at *5. The photographs each depict African-American males similar in age and with similar haircuts and facial hair. (Gov. Ex. 8). Likewise, each photograph is a facial shot, not a side view; each depicts the same profile consisting of the shoulders, neck, and face; and each subject is dressed in civilian clothes, not in prison garb. (Id.). The photographs are all the same size, and the subjects themselves occupy approximately the same amount of space in each photograph. (Id.). Thus, the views or angles presented of each subject, the details of the subjects' physical features, the fact that they all wore civilian clothes, the size of the photographs, and the fact that each was a black and white photo all weigh toward a finding that the array was not unduly suggestive. See Smith, 148 F. App'x at 874-875; Anderson, 156 F. App'x at 220-21; Johnson, 56 F.3d at 954; United States v. Sanchez, 24 F.3d 1259, 1263 (10th Cir. 1994) (finding that a six-person lineup in which the defendant was the only one with his eyes closed was not unduly suggestive); Cikora, 840 F.2d at 896-97 (holding lineup not impermissibly suggestive where defendant's photograph had height markings in the background, and the defendant was a different race than several other persons photographed); Watson, 2008 WL 2163940, at *7 (holding lineup not impermissibly suggestive where all individuals in six-person lineup were of similar age and

complexion, with extremely short hair even though petitioner was only one who was bald and had a lip piercing).

Moreover, contrary to Hutchinson's assertions, the evidence shows that the photographic lineup was not presented in a suggestive manner to K. H.  See [Doc. 55 at 7].  Agent Scott specifically testified that he told K.H. that the man who raped her may or may not be included in the photo array and that he did not make any suggestions to K.H. regarding which photograph was the suspect nor did anyone attempt to influence her in any way.  (Tr. at 118-19).  While Hutchinson points out that Agent Scott testified on cross-examination that he did not recall if he said anything to K.H. about someone else making a prior identification of Hutchinson before presenting her the lineup, see (Tr. at 121), Agent Haley testified that K.H. was not told that anyone had made a prior identification at all in this case, see (Tr. at 127-28).  Therefore, the record does not support Hutchinson's assertion that the lineup was presented to K.H. in a unduly suggestive manner, and it is **RECOMMENDED** that Hutchinson's motion to suppress identification, [Doc. 21], be **DENIED** with respect to the second photo array.[32]

---

[32] Because the photographic arrays are not unconstitutionally suggestive, the inquiry ends there.  Williams, 826 F.2d at 1021 ("We must first decide whether the original identification procedure was unduly suggestive.  If not, that ends the inquiry."); United States v. Jackson, No. 08-21050-CR, 2009 WL 605282, at *6 (S.D. Fla. Mar. 9, 2009) (citation omitted) ("Because the photographic lineups shown to the witnesses were not suggestive, the undersigned does not need to reach the second

## III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Hutchinson's motion to suppress identifications, [Doc. 21], motion to suppress statements, [Doc. 23], and motion to suppress evidence, [Doc. 25], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is not aware of any problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED** and **RECOMMENDED**, this 24th day of June, 2013.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

inquiry, whether the identification was reliable."); see also Perry v. New Hampshire, 132 S. Ct. 716, 730 (2012) ("[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."). Accordingly, the undersigned will not further evaluate the reliability of J.H. and K.H.'s out-of-court identifications. In addition, because the photo arrays were not unduly suggestive, there is no "substantial risk of irreparable misidentification at trial" resulting from the witnesses' exposure to those arrays, Williams, 826 F.2d at 1021 (citations omitted), and J.H., D.P., and K.H. should be permitted to make in-court identifications should this case proceed to trial.